1

2

3                               **UNITED STATES DISTRICT COURT**

4                              **NORTHERN DISTRICT OF CALIFORNIA**

5

6

7    **In re:**                                    **Case No.: 12-CV-6447 YGR**

8    **WILLIAM JAMES DEL BIAGGIO, III,**           **ORDER AFFIRMING BANKRUPTCY DECISION**

9              Debtor.

10

11   _____

12   **LIQUIDATING TRUST COMMITTEE OF THE**
     **DEL BIAGGIO LIQUIDATING TRUST,**
13

14              Plaintiff/Appellee,

15        **v.**

16   **DAVID FREEMAN,**

17

18              Defendant/Appellant.

19

20        Appellant David Freeman brings this appeal from the *Judgment Re Subordination of*

21   *Freeman Claim* ("Judgment") entered by the United States Bankruptcy Court for the Northern

22   District of California, on November 8, 2012, together with the *Memorandum Decision Re*

23   *Subordination of Freeman Claim* ("Decision") entered on the same date.  Freeman contends that

24   the Bankruptcy Court erred as a matter of law in its conclusion that Freeman's fraud claim against

25   debor William James Del Biaggio, III ("Del Biaggio") must be subordinated to all other claims

26   against Del Biaggio's Chapter 11 bankruptcy estate pursuant to section 510(b) of the United States

27   Bankruptcy Code.  11 U.S.C. § 510(b) ("section 510(b)").  Freeman contends that the Bankruptcy

28

*United States District Court*
*Northern District of California*

United States District Court
Northern District of California

1  Court misread the plain meaning of section 510(b) and also ignored the fundamental purpose and

2  application of that statute.

3  Under 28 U.S.C. § 158(a), the Court has jurisdiction to adjudicate appeals from final

4  judgments, orders and decrees of bankruptcy judges.  Pursuant to Rule 8013 of the Federal Rules of

5  Bankruptcy Procedure, this Court "may affirm, modify, or reverse a bankruptcy judge's judgment,

6  order or decree or remand with instructions for further proceedings." Fed. R. Bankr. Proc. 8013.

7  The Bankruptcy Court's decision to subordinate a claim is a "final order" as to that claim.  *In re*

8  *Betacom of Phoenix, Inc.*, 240 F.3d 823, 825 (9th Cir. 2001).  Thus, this Court has full jurisdiction

9  to determine and resolve this appeal.

10  The Court, having reviewed the parties' filings and the record on appeal, **AFFIRMS** the

11  Decision and Judgment of the Bankruptcy Court.  For the reasons stated below, the Court

12  determines that based both upon an appropriate reading of section 510(b) and the underlying

13  purpose thereof, Freeman's claims must be subordinated to those of unsecured creditors.

14  **I.      BACKGROUND**

15  The pertinent facts, as stated by the Bankruptcy Court in its Decision or established by the

16  record of the Bankruptcy Court, follow.  As of the beginning of 2007, the Nashville Predators (the

17  "Predators"), a professional hockey team based in Nashville, Tennessee, was owned by Craig

18  Leipold.  On May 24, 2007, Freeman, a Nashville resident, learned that Leipold was considering

19  selling the Predators to a third party and the team might move to another state.  Freeman initiated

20  an effort to keep the team in Nashville, forming a group of Nashville investors interested in

21  purchasing the Predators from Leipold.  Leipold engaged in negotiations with Freeman, and also

22  engaged in concurrent discussions with other prospective purchasers, including Del Biaggio.

23  Ultimately, Leipold and Gary Bettman, the Commissioner of the National Hockey League

24  (the "NHL"), suggested to Freeman that Freeman's group join forces with Del Biaggio and make a

25  joint bid to buy the Predators, given DelBiaggio's additional professional hockey experience and

26  potential funding.  Freeman and Del Biaggio met and ultimately entered into an agreement by

27  which the Nashville investor group and Del Biaggio would jointly invest in a purchase of the

28  Predators.

United States District Court
Northern District of California

In the multiple meetings and negotiations between Freeman and Del Biaggio, Del Biaggio expressly confirmed his ability to fund his $70 million share of the investment in the Predators, and made a series of representations to Freeman about the significant added value that Del Biaggio would bring to the investor group. First, he claimed to possess valuable connections within the NHL sphere which would support a long-term objective to acquire good standing with and support from the NHL.  Second, Del Biaggio advised Freeman of his plan to acquire a new NHL franchise elsewhere, which would result in a substantial expansion fee payment to the Predators organization. Third, Del Biaggio represented to Freeman that he had considerable experience with professional hockey teams and players, and therefore could assist the Predators' general manager with issues regarding player retention, negotiations and compensation.  Finally, Del Biaggio offered to assist the Predators organization financially by funding player salaries to the extent that they exceeded budget projections thereby ensuring the retention and acquisition of desired hockey players.  Based upon these multiple assurances and representations by Del Biaggio, Freeman agreed to pursue a partnership arrangement with the Del Biaggio and to invest his personal funds alongside the personal funds of Del Biaggio.

On December 7, 2007, the sale closed and Predators Holdings, LLC, was created to purchase 100% of the equity of the Nashville Hockey Club Limited Partnership ("Partnership"), the entity that held the Predators hockey franchise authorized by the NHL.  Predators Holdings, LLC, authorized two kinds of equity investors: (i) "Common Members" (or holders of "Common Units"); and (ii) "Series A Members" (or holder of the "Series A Units").  At closing, Freeman, the other Nashville investors, and an entity controlled by Del Biaggio (Forecheck Investments, LLC, ["Forecheck"]) purchased equity positions:

- Freeman, through his investment vehicle the Commodore Trust, purchased for 31 common units in Predators Holdings for $31 million.  With that equity position, Freeman became its chairman of the board of directors.  He also contributed an additional $5 million loan to Predators Holdings, LLC.
- Del Biaggio invested $25 million to acquire an 83.33% membership interest in Forecheck, which in turn invested $30 million to purchase 30 Series A units of

3

Predators Holdings.[1]  Del Biaggio also provided a guarantee of secured bank debt borrowed by Predators Holdings, LLC, and a guarantee of its stadium lease. Months later, in May 2008, Del Biaggio revealed that he had defrauded Leipold, Freeman and his co-investors.  Del Biaggio had embezzled the funds to make his $25 million investment in Forecheck.  He never had sufficient personal funds or other resources with which to make the promised investments and guarantees resulting in Predators Holdings, LLC, acquiring $40 million in additional secured debt.

Del Biaggio would eventually be arrested, indicted, and convicted for financial crimes constituting felonies, in addition to filing for chapter 11 bankruptcy.[2]  He did not have the resources with which to fund player payroll costs or any other obligations of Predators Holdings, LLC, as promised.  Del Biaggio's reputation and standing with the NHL, intended to benefit Predators Holdings, LLC, were destroyed by his criminal activities.

Once Del Biaggio's fraud and embezzlement became headline news in Nashville, the team's revenues stagnated and profitability plummeted.  Del Biaggio's federal indictment and bankruptcy filing constituted defaults of his personal guarantees.  Predators Holdings, LLC's bank lender threatened to call its loan and terminate all advances.  Its landlord threatened to terminate the Predators' lease.  In response, Freeman replaced Del Biaggio's guarantees with his own in an effort to protect his investment.  Subsequently, Predators Holdings, LLC, with Freeman as its Chairman, was compelled to make capital calls upon its holders of Common Units, the first of which Freeman was able to satisfy by payment of the sum of $2,632,075.  However, Freeman was not financially able to satisfy subsequent capital calls.  The value of his Common Units became heavily diluted and virtually worthless.

---

[1]  Unlike the Common Units in Predators Holdings purchased by Freeman, the Series A Units purchased by Del Biaggio were not subject to capital calls, and were entitled to a liquidation preference over the common units.  *See* Appellant's Appendix, Exh. 2 [Amended Operating Agreement of Predators Holding, LLC, (Predators Operating Agreement)] at Article 12.2.

[2]  Del Biaggio is currently serving an eight-year prison sentence, following his conviction for financial frauds that he perpetrated against investors and other creditors.

United States District Court
Northern District of California

1    Del Biaggio filed a voluntary chapter 11 petition on June 6, 2008.  In October 2008,

2    Freeman filed a general unsecured claim against Del Biaggio's chapter 11 estate for damages

3    arising from Del Biaggio's fraudulent misrepresentations to Freeman, in the amount of

4    $38,632,075, the sum of Freeman's initial investment and his capital call compliance.

5    On September 23, 2011, the Bankruptcy Court confirmed a liquidation plan proposed by the

6    Trustee and the creditors' committee in Del Biaggio's chapter 11 case.  The Plan provides generally

7    for the liquidation and distribution of remaining estate assets, and classifies all allowed general

8    unsecured claims against Del Biaggio within Class 3.  Among other terms, the Plan caused the

9    establishment of the Liquidating Trust Committee of the Del Biaggio Liquidating Trust (the

10   "Committee"), whose authority included continued prosecution of claim objections.

11   Freeman filed a First Amended Proof of Claim ("FAPC") on March 23, 2012.  The

12   Committee objected to the claim and moved for summary judgment on two alternative grounds: (a)

13   that the claim was derivative of the claims submitted (and withdrawn) by Predators Holdings; and

14   (b) that the claim was subject to subordination under the provisions of Section 510(b).  In an order

15   issued July 30, 2012, the Bankruptcy Court ruled that the FAPC failed to set forth allegations of

16   fraud with sufficient specificity.  The Bankruptcy Court directed Freeman to file a Proposed Second

17   Amended Proof of Claim ("Amended Claim"), which he did on August 10, 2012.  After

18   consideration of the arguments and briefing of counsel, on November 8, 2012, the Bankruptcy

19   Court granted the Committee's motion for summary judgment, deciding as a matter of law that

20   Freeman's Amended Claim was subject to subordination under Section 510(b) of the Bankruptcy

21   Rules.  The Bankruptcy Court entered its Decision and Judgment, and Freeman's Amended Claim

22   was subordinated on that basis.

23   **II.       STANDARD OF REVIEW**

24   The Bankruptcy Court's decision granting summary judgment is reviewed by this Court *de*

25   *novo*.  *In re Caneva*, 550 F.3d 755, 760 (9th Cir. 2008) (*de novo* standard for summary judgment);

26   *Beal Bank v. Crystal Props., LTD. (In re Crystal Props., LTD.)*, 268 F.3d 743, 755 (9th Cir. 2001)

27   ("[T]he district court functions as an appellate court in reviewing a bankruptcy decision and applies

28   the same standards of review as a federal court of appeals.").  As acknowledged by the Bankruptcy

United States District Court
Northern District of California

Court, there were no disputes of material fact.  Since the appeal here concerns a pure question of law, the Court reviews the case from the same position as the Bankruptcy Court.  *See In re American Wagering, Inc.* 493 F.3d 1067 (9th Cir. 2007); *see also FTC v. Stefanchik*, 559 F.3d 924, 927 (9th Cir. 2009) ("A bankruptcy court's conclusions of law are subject to plenary review and are considered de novo by the reviewing court, including the appellate court *de novo* review of a decision to grant summary judgment); *Lawrence v. Dep't of Interior*, 525 F.3d 916, 920 (9th Cir. 2008) (*de novo* review requires that the appellate court view the case from the same position as the Bankruptcy Court).

## III.    DISCUSSION

### A.    APPLICATION OF SECTION 510(B) TO FREEMAN'S AMENDED CLAIM

The central issue in Freeman's appeal is the meaning and application of the Bankruptcy Code's mandatory subordination provision, section 510(b).  To illustrate the plain reading of Section 510(b), the Court rearranges the formatting only of the operative provision which states as follows:

> (b) For the purpose of distribution under this title,
>      a claim
>           arising from rescission of a purchase or sale of a security of the
>                debtor or of an affiliate of the debtor,
>           for damages arising from the purchase or sale of such a security, or
>           for reimbursement or contribution allowed under section 502 on
>                account of such a claim,
>
>      shall be subordinated to all claims or interests that are senior to or equal
>      the claim or interest represented by such security,
>
>      except that if such security is common stock, such a claim has the same
>      priority as common stock.

11 U.S.C. § 510(b).  The Amended Claim here does not seek either "rescission" or "reimbursement or contribution" under section 510.  Thus, the operative question is whether it seeks "damages arising from the purchase or sale of a security of the debtor [Del Biaggio] *or of an affiliate* of the debtor [Del Biaggio]."  If so, the statute requires that the "claim for damages" be subordinated, but

6

even then subordinated *only* to claims "senior to or equal the claim or interest represented by such security."   The Court addresses each of these components in turn.

### 1.    *A Claim for Damages Arising From the Purchase or Sale of a Security*

Freeman alleges that his Amended Claim arises *not* from the purchase or sale of a security but on account of debtor Del Biaggio's fraud as a third-party co-investor.  Del Biaggio is alleged to have made representations in order to induce Freeman to purchase securities in Predators Holdings, LLC.  In applying the statute here, two questions arise: (1) is Predators Holdings, LLC, an "affiliate" of Del Biaggio, such that the purchase of a security of Predators Holdings, LLC, would fit within section 510(b);[3] and (2) do the alleged damages here "arise from" the purchase of those securities?

As to the first question, Freeman concedes, and the Bankruptcy Court found, that Predators Holdings, LLC, is an "affiliate" of Del Biaggio, as that term is defined in the Bankruptcy Code. *See* 11 U.S.C. § 101(2)(B) ("'affiliate' means…corporation 20 percent or more of whose outstanding voting securities are directly or indirectly owned, controlled, or held with power to vote, by the debtor, or by an entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor")[4].  Thus, under a straightforward reading of the statute, a dispute arising from the purchase or sale of a security in Predators Holdings, LLC, would be subject to section 510(b), just as if it were a security "in Del Biaggio" himself.  *See In re VF Brands, Inc.*, 275 B.R. 725, 727 (Bankr. D. Del. 2002) ("[t]he language of section 510(b) applies equally to claims arising from purchase of the stock of an

---

[3]  As Del Biaggio is a natural person, the notion of purchase or sale of a security "in" Del Biaggio makes little sense.  All parties acknowledge that the security interest at issue here is in Predators Holdings, LLC, not Del Biaggio.

[4]  Further, the definition of a "corporation" under the Bankruptcy Code includes, among other things: "(i) association having a power or privilege that a private corporation, but not an individual or a partnership, possesses; (ii) partnership association organized under a law that makes only the capital subscribed responsible for the debts of such association; [and] (iii) joint-stock company."  11 U.S.C. § 101(9).  And the definition of "security" includes such interests as a note, stock, bond, debenture, certificate of deposit, transferable share, or "investment contract or certificate of interest or participation in a profit-sharing agreement," among others. 11 U.S.C. §101(49)(A).

United States District Court
Northern District of California

1    affiliate, including a subsidiary, of the debtor as it does to the purchase of stock of the debtor

2    itself.").

3          Next the Court addresses whether the Amended Claim is found to be one "arising from" the

4    purchase or sale of securities in Predators Holdings, LLC.  Said differently, the query focuses on

5    whether the Amended Claim can, or should, include the fraud claims asserted by Freeman against

6    Del Biaggio.  Generally, in interpreting the meaning of statutory language, a court starts with the

7    words of the statute themselves.  *See In re Tristar Esperanza Properties, LLC*, 488 B.R. 394, 400

8    (B.A.P. 9th Cir. 2013) (the starting point for understanding the meaning of a statute is the language

9    of the statute itself ) (citing *Lamie v. United States Tr.,* 540 U.S. 526, 534 (2004)) ("*Tristar*").

10   "Plain meaning should be conclusive, except when literal application will produce a result

11   demonstrably at odds with the intentions of its drafters."  *Id.* (internal citations omitted).  Only if

12   the plain meaning is ambiguous does a court look to such interpretive aids as "canons of

13   construction, legislative history, and the statute's purpose to discern Congress's intent."  *Id.* (citing

14   *James v. City of Costa Mesa,* 700 F.3d 394, 399 n. 8 (9th Cir.2012)).

15         Section 510(b)'s "arising from" language has been found ambiguous by all circuits that

16   have considered it, including the Ninth Circuit.  *Tristar*, 488 B.R. at 401 (citing decisions of the

17   Second, Third, Fifth, Ninth, and Tenth Circuits).  Thus, courts called upon to interpret section

18   510(b) have looked to the legislative history and statutory purpose of section 510(b).  These courts

19   have consistently found that Congress relied heavily on an analysis which drew distinctions

20   between the different expectations of investors versus those of creditors, concluding that such

21   distinctions warranted giving priority to creditors over investors when analyzing bankruptcy claims.

22   *See* H. Rep. 95-595, at 195 (1977), U.S. Code Cong. & Admin. News 1978, 5787, 6155 (explaining

23   that the argument for mandatory subordination is best described by Slain & Kripke, *The Interface*

24   *Between Securities Regulation and Bankruptcy-Allocating Risk of Illegal Securities Issuance*

25   *Between Securityholders and the Issuer's Creditors,* 48 N.Y.U. L.Rev. 261 (1973)); *see also In re*

26   *Granite Partners, L.P.*, 208 B.R. 332, 336 (Bankr. S.D.N.Y. 1997) ("Any discussion of section

27   510(b) must begin with the 1973 law review article authored by Professors John J. Slain and Homer

28   Kripke.").  "Shareholders expect to take more risk than creditors in return for the right to participate

United States District Court
Northern District of California

in firm profits[, while t]he creditor only expects repayment of a fixed debt.  It is unfair to shift all of the risk to the creditor class since the creditors extend credit in reliance on the cushion of investment provided by the shareholders."  *In re Betacom of Phoenix, Inc.*, 240 F.3d 823, 829 (9th Cir. 2001) (citing *Granite Partners,* 208 B.R. at 336-37).  "Without § 510(b), shareholders with a valid claim for damages have the same rights as creditors to recover their investment in the bankrupt firm, the same investment that the creditors relied on when extending credit."  *Betacom*, 240 F.3d at 831.  Congress fashioned section 510(b) to ensure that a security holder who seeks to rescind his purchase or to sue for damages based on that purchase is not treated the same as a general unsecured creditor, since that security holder bargained for greater risk and the potential for profit in a way that the general unsecured creditor did not.  *See id.* at 830-31; *Tristar,* 488 B.R. at 402.

Based upon this legislative history, the Ninth Circuit has held repeatedly that the phrase "damages arising from the purchase or sale" of a security should not be limited to securities fraud cases,[5] but should be interpreted broadly consistent with the policy reasons expressed by Congress for its adoption.  *Tristar,* 488 B.R. at 403; *Betacom,* 240 F.3d at 828-29; *In re Am. Wagering, Inc.*, 493 F.3d 1067, 1071-72 (9th Cir. 2007).[6]  Thus the Ninth Circuit has held that subordination is appropriate "where there exists 'some nexus or causal relationship between the claim and the purchase of the securities.'" *In re Am. Wagering, Inc.*, 493 F.3d at 1072 (quoting *In re Telegroup, Inc.,* 281 F.3d 133, 138 (3d Cir. 2002)); *see also Betacom,* 240 F.3d at 829.  Moreover, in determining whether a claim should be seen as "arising from" the purchase or sale of securities, "the presence of merely one of the dual [policy] rationales is sufficient." *Tristar,* 488 B.R. at 404 (citing *Waltzer v. Nisselson (In re MarketXT Holdings Corp.),* 346 Fed.Appx. 744, 746 (2d Cir. 2009).

---

[5]  There is no question that securities fraud cases fall squarely within the ambit of section 510(b).  *Betacom*, 240 F.3d at 828; *Telegroup,* 281 F.3d at 143.

[6]  Claims for fraudulent inducement to purchase securities have been held to be covered expressly by the language of section 510(b). *See In re Geneva Steel Co.*, 281 F.3d 1173, 1174 (10th Cir. 2002) (section 510(b) has been "universally" held to apply to allegations of fraud in the inducement to sell or purchase a security interest).

United States District Court
Northern District of California

1    Freeman urges a reading of section 510(b) requiring that debtor be the seller of the

2    securities giving rise to the claim.  The cases on which Freeman relies do not mandate such a

3    finding.  *See In re Granite Partners, L.P.,* 208 B.R. 332, 334-35, 342 (Bankr. SDNY 1997)

4    (extending section 510(b) to claims of post-investment fraud arising out of both the debtor's fraud

5    and the debtor's insiders fraud held to be subordinated under a doctrine of respondeat superior and

6    cautioning not to shift to creditors any investment risk); *In re VF Brands, Inc.*, 275 B.R. 725, 727

7    (Bankr. Del. 2002) (holding that "the language of section 510(b) applied equally to claims arising

8    from the purchase of the stock of an affiliate, including a subsidiary, of the debtor as it does to the

9    purchase of stock of the debtor itself"); *In re Betacom of Phoenix, Inc.,* 240 F.2d 823 (9th Cir.

10   2001) (subordination of claims based on promissory notes if the same arise from the sale or

11   purchase of stock); *In re Lernout & Hauspie Speech Prod., N.V.,* 264 B. R. 336 (Bankr. Del. 2001)

12   (finding claims arising from acquisition of stock in debtor's affiliate would be subordinated to

13   unsecured claims against the debtor).  The statute covers claims arising from the "purchase or sale

14   of a security of the debtor *or of an affiliate of the debtor*."  11 U.S.C. § 510(b) (emphasis added).

15   The interpretation Freeman urges would, in effect, eliminate from the statute's coverage claims

16   arising from the purchase or sale of a security "of an affiliate of the debtor," in contravention to the

17   plain language of the statute.

18   Here, Freeman's Amended Claim is tied inextricably to the sale or purchase of a security of

19   Del Biaggio's affiliate, Predators Holdings, LLC.  Freeman alleged that he was fraudulently

20   induced to invest in Predators Holdings, LLC, by Del Biaggio, and that he was damaged as a result

21   of that purchase.  His initial claim alleged "loss of investment value in Predators Holdings, LLC."

22   (Freeman Appendix 000105).  His amended proof of claim asserted that, "[i]n reasonable reliance

23   upon [Del Biaggio]'s fraudulent statements and assurances of personal resources and

24   trustworthiness made by [Del Biaggio, Freeman] began investing millions of dollars in Holdings."

25   (Committee's Supplemental Appendix 0082-0083.)  Freeman seeks (i) both the return of his

26   investment in Predators Holdings, LLC, as the measure of his damages, *i.e.*, $31 million for his

27   purchase 31 Common Units, and the $5 million personal loan to Predators Holdings, and (ii) the

28   additional $2,632,075 invested based on the subsequent capital calls.  Freeman's attempt to isolate

United States District Court
Northern District of California

1    himself with the singular thread of Del Biaggio's fraud ignores the fabric of the Amended Claim

2    itself and his own integral role, not just as investor, but as Chairman of the Board.   The Court

3    therefore concludes that Freeman's damages are causally related to the "purchase or sale of

4    securities" in Predators Holdings and arise from that "purchase or sale" within the broad meaning

5    of section 510(b).[7]

6            This conclusion is consistent with the purposes underlying section 510(b).  Freeman

7    purchased Common Units, executed a promissory note, and paid additional monies to Predators

8    Holdings, LLC, all in the expectation of profiting from the investment.  The risks he assumed in

9    accepting what turned out to be misrepresentations and falsehoods by Del Biaggio were no

10   different, essentially, from the risks any investor takes in a business venture.  His injury is the same

11   as any investor who has fallen prey to securities fraud or similar fraudulent inducements to invest.

12   Thus, the equities favor treating Freeman the same as any other bankruptcy claimant alleging fraud

13   arising from the purchase or sale of securities of the debtor or debtor's affiliate.  As the Ninth

14   Circuit stated in a pre-Bankruptcy Code case:

15           While the stockholder does not necessarily assume the risk that an *independent

16           third-party* might join the fraud, the third party here is a *member of the corporate

         family*, a wholly-owned subsidiary of the issuer.  We fail to see why the relative

17           equitable position of a defrauded stockholder should be enhanced simply because

         the issuer elects to carry out its fraudulent scheme via the common corporate

18           practice of doing business through a wholly-owned subsidiary.

19   *In re THC Fin. Corp.*, 679 F.2d 784, 786 (9th Cir. 1982) (emphasis added).  As in *THC*, Del

20   Biaggio is no mere independent third party joining in the fraud alleged, but was Freeman's co-

21   investor.  Del Biaggio's fraud is directly and causally connected to Freeman's purchase of a

22   security interest in Predators Holdings.  Freeman stood to gain substantially from his investment in

23   Predators Holdings (the Debtor's affiliate).  He held a significant voting interest and served as

24   Chairman of the Board.  To permit him to claim against the bankruptcy estate on a par with other

25   unsecured creditors of Del Biaggio who did not have a collaborative venture, in spite of his position

26

27           ───────────────────────

28           [7]   Under 11 U.S.C. § 101(49)(A)(i), the term "security" includes a promissory note that was part of a transaction for purchase or sale of an equity interest.  *See Betacom,* 240 F.3d at 832.

as an investor in Del Biaggio's affiliate company, would work the precise unfairness section 510(b) was meant to address.[8]

### 2.    Claims Senior or Equal to Freeman's Claim

Freeman next argues that section 510(b) should not apply here because his claims do not fall into the same priority scheme as other claims against Del Biaggio, and therefore the second element necessary for subordination is not met, namely that "claims… for damages arising from the purchase or sale of such a security… shall be subordinated to all claims or interests that are *senior to or equal the claim or interest represented by such security*." 11 U.S.C. § 510(b) (emphasis supplied). Freeman contends that his claims against Del Biaggio and his interests in Predators Holdings, LLC, are not senior or junior to each other because they simply do not compete for the same assets or distributions.

Freeman misreads the statute. Just as his claims arise from the purchase or sale of his security interest in the Debtor's affiliate (Predators Holdings, LLC), the seniority question likewise looks to the priority of the claim or interest represented by his security interest *in the debtor's affiliate*. As above, Freeman's argument must be rejected because it would rendering meaningless the word "affiliate," such that claims against the debtor, arising from the purchase or sale of a security in debtor's affiliate, would never fall into the same priority scheme vis-à-vis the debtor, even though the statute expressly applies to such claims.

The Bankruptcy Court found, as against the Del Biaggio estate, the claims of creditors of Del Biaggio are senior to the claims of those with security interests in Predators Holdings, LLC, including Freeman. This holding is consistent with other relevant authorities. Under section 510(b), Freeman's claim could not have a greater priority to the Del Biaggio estate than the security from which his claim arises. *See* 11 U.S.C. § 510(b) ("shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security"). Shares in a

---

[8] While the parties offer no evidence on the second policy rationale – creditors' reliance on the equity cushion provided by Freeman's investment – such evidence is unnecessary to find that subordination of Freeman's claims is consistent with the intent of section 510(b). *Tristar*, 488 B.R. at 404.

United States District Court
Northern District of California

1  subsidiary or affiliate do not give rise a claim directly against the assets of a parent company.  *In re*

2  *VF Brands*, 275 B.R. 725, 727 (Bankr. D. Del. 2002).

3          In *VF Brands*, as here, the claimant argued that its claim, arising from the purchase of stock

4  in the debtor's subsidiary (*i.e.*, affiliate), should not be subordinated in priority behind the

5  unsecured creditors of the debtor-parent, since claimant was not a shareholder of the debtor-parent

6  and therefore not part of the same distribution priority scheme as creditors of the debtor.  *Id.* at 727.

7  The court rejected that argument, stating that while shareholders of a subsidiary are not normally

8  part of the distribution scheme of the parent, the claimant became part of the distribution scheme of

9  the parent when it asserted an unsecured claim against the parent in the bankruptcy.  *Id.* at 727.  In

10  the absence of section 510(b), such a claim might be treated as being on the same priority level as

11  other unsecured creditors of the debtor-parent.  But by operation of section 510(b), such a claim is

12  subordinated to the claims of general unsecured creditors of the debtor-parent.  *Id.*

13          Similarly, in *Lernout*, the claim at issue arose from securities in L&H.  Claimants asserted

14  their claims in the bankruptcy proceedings of both L&H and its parent.  Claimants agreed that their

15  claims against both entities arose from acquisition of securities, and therefore were subject to

16  subordination under section 510(b).  Their disagreement concerned whether their claims in the

17  parent's bankruptcy should be subordinated in priority behind the general unsecured creditors of the

18  debtor-parent, or behind the general unsecured creditors *of the affiliate vis-à-vis the debtor-parent.*

19  *Lernout,* 264 B.R. at 340.  The court in *Lernout* found that the statute could support either reading,

20  but ultimately held that the correct approach was one subordinating the claims arising from the

21  affiliate's securities to the same level as holders of common stock in the debtor-parent, and *behind*

22  the general unsecured creditors of the debtor-parent.  *Id.* at *344.

23          Freeman has claimed against Del Biaggio based upon claims arising from Freeman's

24  investment in Del Biaggio's affiliate – a claim that falls in the same priority scheme as against Del

25  Biaggio, behind the claims of unsecured general creditors.  Freeman's argument does nothing to

26  change the result that his fraud claims are subordinated to the claims of general, unsecured

27  creditors.

28

**C.      SUBORDINATION OF PROMISSORY NOTE PORTION OF AMENDED CLAIM**

Freeman argues, in the alternative, that at a minimum, the portion of his damage claim related to the $5 million promissory note from Predators Holdings should not be subordinated, but should be treated as a general unsecured claim in the Del Biaggio bankruptcy estate.  He asserts that the Bankruptcy Court's analysis in the underlying decision here is inconsistent with its decision in *In re Nat'l Farm Fin. Corp.*, 07-31580 TEC, 2008 WL 410236 (Bankr. N.D. Cal. Feb. 12, 2008):

> Part of what Mr. Freeman owns is a $5,000,000 promissory note issued by [Predators] Holdings.  That note is senior to Mr. [Del] Biaggio's interest in [Predators] Holdings, and must be paid before any members receive distributions.  As a result, the Bankruptcy Court's distinction of the present case from the *National Farm* case is mistaken, at least as to the $5,000,000 note.  At a minimum, therefore, the District Court should reject the Bankruptcy Court's subordination of the Amended Claim to the extent of $5,000,000.

(Reply Brief at 14:17-22.)  While in a vacuum the argument may have appeal, Freeman conflates issues with this argument.

First, the decision in *In re Nat'l Farm* is inapposite to the circumstances presented in this case, since the issue discussed there was the relative priorities of two different claims *both* alleged to arise from the sale or purchase of securities.  *In re Nat'l Farm Fin. Corp.*, 2008 WL 410236 at *4.  The Bankruptcy Court determined that the term "such security" in Section 510(b) requires that a bankruptcy claim have the same priority as the security that gave rise to the claim.  *In re Nat'l Farm Fin. Corp.*, 2008 WL 410236 at *4.  Thus, a claim *arising from the purchase of* the subsidiary's common stock has the same priority as that the common stock itself vis-à-vis the bankruptcy estate.  *Id.*  There, to "the extent a claim exceeds the equity of the subsidiary [at issue], the claim would be subordinated at the parent level.  Under section 510(b), the claim is given the [same] priority of the subsidiary's common stock, and shares of a subsidiary create no interest in the assets of the parent."  *In re Nat'l Farm Fin. Corp.*, 2008 WL 410236 at *4 (citing *In re VF Brands, Inc.,* 275 B.R. 725, 727 (Bankr.D.Del. 2002).

The solvency of Predators Holdings. LLC, does not appear to make any difference to the analysis of priorities here.  It is *Del Biaggio*, not Predators Holdings, LLC, that filed for chapter 11 in the underlying proceedings.  As the Bankruptcy Court noted in its Decision, Predators Holdings

14

is not the debtor, and the court was not charged with determining distributions to *its* creditors and equity holders in these proceedings.  Freeman has made a claim against the Del Biaggio bankruptcy estate.  Under the terms of section 510(b), the priority of his claim is at the level of priority of the security in Predators Holdings in relation to the estate.  Section 510(b) requires that the claim *against the Del Biaggio bankruptcy estate* be subordinated to general unsecured creditors.[9]

Second, under section 101(49)(A)(i), the term "security" includes a promissory note.  The promissory note was issued by Predators Holdings (not Del Biaggio) to Freeman on account of Freeman's investment in Predators Holdings.   It is, like the common units and capital call investment, an equity interest in an affiliate of Del Biaggio.  Thus, any claim against Del Biaggio arising from the issuance of that Note is subordinated just the same as the other securities of the debtor's affiliates.  *See In re Betacom of Phoenix, Inc.,* 240 F.3d 823, 832 (9th Cir. 2001).

### D.   EFFECT OF SUBORDINATION UNDER THE TERMS OF THE CONFIRMED PLAN

Finally, Freeman argues that even if his Amended Claim is subordinated under Section 510(b), the Plan confirmed in the Del Biaggio's chapter 11 case makes no distinction between senior and subordinated unsecured claims, instead lumping them all into one class for all allowed unsecured claims, Class 3.  Thus, Freeman contends that his Amended Claim is entitled to *pro rata* distribution along with all other Class 3 claims, regardless of its subordinated status.

As the Bankruptcy Court noted, the Plan expressly reserved all of the bankruptcy estate's claims, defenses, and objections.  (Chapter 11 Trustee's and Official Committee of Unsecured Creditors' Joint Plan of Liquidation ["Plan"], Appellant's Designation of Record, Exh. 2, Dkt. No. 5-2 at §§ 1.17, 5.7.)  Nothing in the Plan waives or releases the Committee's right to seek subordination of any claim, or alters the right to pursue an adversary proceeding such as this one.  Nor does Freeman offer any authority to support the notion that confirmation of a plan would preclude objections or proceedings for subordination of a claim where the plan otherwise itself

---

[9]   Further, as Freeman himself argues, there is no evidence in the record regarding the assets of Predators Holdings, the level of Series A capital in Predators Holdings, or the equity in Predators Holdings that could satisfy any claims against it.  (Opening Brief at 24:6-7, 8-11.)  To the extent the Bankruptcy Court suggested anything to the contrary in its Decision, the statements made no difference to the subordination analysis.

reserves such rights.  Certainly, the Plan here could have included a provision for subordinated claims more specifically.  *Cf. In re Sw. Florida Heart Grp., P.A.*, 384 B.R. 311, 314 (Bankr. M.D. Fla. 2008) (determining that terms of plan dictated that claim fell into "Class 5B as a subordinated claim" despite any other argument for allowance under Bankruptcy Code).  However, the lack of such a provision does not prevent the Committee from objecting and seeking a determination that it is subordinated now.  Consequently, the Court finds unpersuasive Freeman's arguments for treating his claim as equal to the unsecured creditors' claims within Class 3 of the confirmed Plan, despite subordination.

## IV.    CONCLUSION

For the foregoing reasons, the Court finds that Freeman's Amended Claim is subject to mandatory subordination under the terms of section 510(b), which operates to place his Amended Claim in lower priority than the claims of general unsecured creditors of the Del Biaggio Estate and all claims senior to those general unsecured claims.  The terms of the Plan do not preclude such a determination, nor does any authority cited by Freeman.

Therefore, the Bankruptcy Court's Decision and Judgment are **AFFIRMED**.

**IT IS SO ORDERED**.

Date: November 18, 2013

_____
**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**